**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| MAIA PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SASANK C. KUNADHARAJU, <br><br> Defendant. | CIVIL ACTION NO. |

**VERIFIED COMPLAINT IN SUPPORT OF PLAINTIFF'S**
**APPLICATION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff MAIA Pharmaceuticals, Inc. ("MAIA" or the "Company") through its undersigned counsel, Porzio, Bromberg & Newman, PC and Law Office of David R. Lurie PLLC, by way of Verified Complaint against defendant Sasank C. Kunadharaju ("Kunadharaju"), alleges and says:

**INTRODUCTION**

1.     This is a proceeding seeking, among other things, to address the Defendant's misappropriation – and likely theft – of MAIA's most competitively valuable confidential information,

2.     MAIA is a New Jersey pharmaceutical company that has spent millions of dollars, and countless hours of research and development, to develop trade-secrets, including respecting manufacturing know how, that are among the Company's most valuable assets.

3.     Until January 14, 2022, Defendant was MAIA's Senior Director, Product Development.

1

4.      In that capacity, Defendant had responsibilities related to three of the Company's products.  By virtue of his seniority, however, Defendant had the ability to access files containing virtually all of the Company's trade secrets and other confidential information, including access to a password protected secure cloud server, on which MAIA maintains its most sensitive documents containing its trade secrets and other competitively sensitive and confidential information.

5.      Defendant entered into two comprehensive confidentiality and non-disclosure agreements with the Company whereby he agreed, among other things, to access – and use – MAIA's confidential information solely for work-related purposes, and to maintain their confidentiality.

6.      On January 14, 2022, Defendant informed the Company of his intention to resign, and later agreed to a February 4, 2022 departure date.  Defendant later admitted to the Company that he had resolved to resign at the beginning of December 2021, but chose to wait to provide his notice about 45 days later.

7.      On January 20, 2022, the Company presented Defendant with a normal course termination agreement, which – if executed – would have entitled him to receive a severance payment.  The draft agreement, among other things, included an affirmation of Defendant's existing contractual non-disclosure, confidentiality, as well as non-competition, obligations to the Company.

8.      The document also listed the several Company projects on which Defendant had worked accurately stating that they fell within Defendant's existing confidentiality and restrictive covenant and non-competition obligations.

2

9.      Defendant, however refused to execute the draft termination agreement, and stated that he preferred to be bound only by his existing confidentiality and non-competition agreements with the Company which he (falsely) described as "vague."

10.     Recognizing that Defendant's statements were suspicious, the Company immediately conducted a review of Defendant's history of accessing the Company's secure server. The review disclosed that, during the months preceding his notice of resignation, Defendant had systematically downloaded 30,000 Company documents from the secure server.

11.     The documents at issue contain much of the Company's most competitively sensitive materials, including pharmaceutical formulae, laboratory procedures, manufacturing processes, business agreements and price information.

12.     Many of the documents Defendant downloaded were entirely unrelated to the three MAIA products he worked on; accordingly, he accessed and downloaded such materials in express violation of his NDAs with the Company.

13.     Additionally, Defendant downloaded approximately 10,000 of the documents at issue between during and after December 2021, after (on his own account) Defendant had decided to leave the Company and was, apparently, preparing for his departure.

14.     On January 21, 2022, Defendant informed the Company that he had decided to leave the Company effective retroactively on January 14, 2022, not February 4, 2022, as previously agreed.  On that date, he also sent an electronic message reiterating his rejection of the draft termination agreement.

15.     Also on January 21, 2021, MAIA's consultant retrieved Defendant's Company laptop from Defendant at his residence, and later delivered it to a forensic computer specialist for examination, who reviewed the laptop in conjunction with a log that recording every time that the

Defendant accessed, and downloaded data from, MAIA's secure sever. The forensic specialist's examination established among other things:

16.     First, that Defendant had deleted virtually all of the MAIA related work product that previously resided on the hard drive of the device, including all of the documents containing MAIA's confidential information that he had downloaded from the secure server.

17.     Second, that, during or around the time that Defendant been downloading huge volumes of documents containing MAIA's trade secrets and other confidential information from the Company's secure server, Defendant  attached a host of devices to the computer's USB ports, including a number of mass storage devices and other devices that may be used to download or copy files.  It is not only possible, but likely that some or all of the documents that Defendant downloaded from MAIA's secure server were downloaded directly to – or were transferred to – one or more of these devices; but a forensic review of each of these storage devices will be required to determine what data Defendant transferred to them.

18.     Third, also during and around time periods in which he was downloading Company confidential information from the MAIA secure server, Defendant used his Company computer to access a personal "Google Drive" account – an Internet based service that may be utilized to store large volumes of data.  Once again, it is not only possible, but likely that some or all of the documents that Defendant downloaded from MAIA's secure server were downloaded directly to – or were transferred to – Defendant's Google Drive account. As in the case of the mass storage devices, it is necessary for MAIA's forensic investigator to obtain access to the Google Drive account to determine what MAIA data Defendant transferred to that account.

19.     Finally, while Defendant deleted virtually all of his work-related files from his Company laptop, he did not delete the "browser history" records, reflecting the websites the

Defendant used the laptop to visit, including the website used to access MAIA's secure server. Those and certain other records establish that Defendant used another, non-Company, computer to download and purloin MAIA's documents containing MAIA's trade secrets.

20.    The log that recorded all of Defendant's visits to MAIA's secure server indicates that on December 10 and 17, 2021, Defendant used his password to access the secure server and to download approximately 6,500 containing some of MAIA's most competitively sensitive and valuable trade secrets.

21.    The laptop's browser history, however, shows that the Defendant did not visit the secure server from that Company device on those two days.   Accordingly, the forensic examiner concluded that Defendant employed another computer, in addition to his MAIA-issued Company computer, to access the secure server, download and purloin MAIA's trade secrets and other confidential information.

22.    On January 24, 2022, MAIA sent Defendant a cease a desist letter reciting the volume and nature of the MAIA materials he had misappropriated from MAIA's secure server, and demanding that Defendant, among other things, list all Company confidential information he downloaded, state where all copies of such information was located, and identify every person or entity to which he had transferred such materials

23.    On January 25, 2022, Defendant sent a responsive letter effectively conceding that he had the downloaded the materials, but offering no account of what he had done with them.

24.    Accordingly, on January 26, 2022, the Company sent Defendant a second letter stating that Defendant's initial response was "unsatisfactory," and demanding a certification, under penalty of perjury, identifying, among other things. any "device, location, person or entity" (other than the Company laptop) to which MAIA documents were copied or transferred, via email, server,

5

6705441

backup service or external storage device, and providing the Company with access to any such devices or accounts, including passwords.

25.    On January 27, 2022, Defendant forwarded an executed copy of the certification, expressly asserting that he had solely used his MAIA laptop to download MAIA's confidential information and specifically and unequivocally representing that he had not transferred any such materials to an external device or account.

26.    As explained above, the forensic examination of the Company laptop established that Defendant's representations were almost certainly false, and that Defendant did transfer MAIA's confidential information to one or more external devices or accounts, and then wiped much of the data on the Company laptop in an effort to cover his tracks.

27.    Only two logical conclusions can be drawn from Defendant's misappropriation of MAIA's trade secrets, the likely transfer of those materials to one or more external devices or accounts, and his wiping of the computer and mendacious responses to MAIA's inquiries: 1) Defendant plans to engage in improper competition with the Company by using MAIA's trade secrets without incurring the substantial investment the Company has made developing them; or 2) Defendant conspired with a competitor to improperly misappropriate and share the Company's trade secrets.

28.    Accordingly, in order to prevent further dissemination or other misuse of its trade secrets and other confidential information, and the resulting irreparable harm, MAIA petitions this Court for emergent relief.

6705441

## THE PARTIES, JURISDICTION AND VENUE

29.     Plaintiff MAIA Pharmaceuticals, Inc. is a Delaware corporation, with its principal place of business located at 707 State Rd. Ste. 104, Princeton, New Jersey 08540.

30.     Defendant Sasank C. Kunadharaju is a natural person who resides at 32 Stony Rd, Edison, New Jersey 08817.

31.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331 and the federal Defend Trade Secrets Act, 18 U.S.C. §1836(b)(1) & (c).

32.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367 because they arise out of the same facts such that they form part of the same case and controversy.

33.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the resulting injuries were caused by Defendant in this District and MAIA conducts business within this District.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

34.     The Company. MAIA was established in 2013, as a specialty pharmaceutical company that identifies, develops, manufactures and markets generic and innovative pharmaceutical products, and seeks to commercialize its products globally.

35.     The Company develops its products through extensive research and development efforts, and that research, and the resulting know how, which the Company takes extensive efforts to maintain as confidential, are among the Company's most valuable assets.

36.     MAIA's pipeline of complex pharmaceutical products is a result of its research and development expertise and know-how, which was developed at great expense.  MAIA is not a traditional generics company.  It develops products that are improvements over existing patent medications by addressing challenges in formulation and manufacturing processes.  The generics

marketplace is extremely competitive, and the dissemination of MAIA's trade secrets, and confidential and proprietary information to competitors would threaten the Company's survival.

37.    The Company has 15 products in various stages of research, development and commercialization.  These products cover a broad range of clinical applications, including diagnostic testing; inflammatory, allergic and immunologically mediated conditions; oncology; skeletal muscle spasms; anti-biotics (and their precursor compounds); hypothyroidism; and hyperammonemia.[1]

38.    <u>MAIA's trade secrets</u>.  All of the Company's confidential information and trade secrets are not known outside the Company; were created by the Company over many years of extensive research involving large investments of capital and labor; were developed by the Company for internal use only and with the expectation of deriving economic benefit; and are inherently and intrinsically valuable.

39.    All of the Company's confidential information and trade secrets are related to multiple products used in, or intended for use in, interstate and international commerce.

40.    All of the Company's confidential information and trade secrets allow the Company to develop its products more efficiently and with quality and precision greater than its competitors — exactly what sets the Company apart from them.

41.    The misuse or exploitation of this information by competitors would allow them an unfair advantage over the Company, and would allow such competitors to divert and convert the Company's actual and prospective revenues, causing irreparable injury to the Company.

---

[1] MAIA has obtained approval from the FDA for an abbreviated new drug application ("ANDA") under section 505(j) of the Federal Food, Drug, and Cosmetic Act ("FD&C Act") for Sodium Phenylacetate and Sodium Benzoate Injection, 10%/10%, 50 mL single-dose vial, an adjunctive therapy in pediatric and adult patients for the treatment of acute hyperammonemia and associated encephalopathy in patients with deficiencies in enzymes of the urea cycle.

6705441

42.     The Company takes reasonable measures, under the circumstances, to maintain the confidentiality of its trade secrets, and proprietary and confidential information, including securing them on a password protected server.  The Company uses SecureDocs, a virtual data room to store, share and manage sensitive and confidential Company trade secrets and information.   An authorized user may only access the system and secure data room through a password and a two-factor authentication.

43.     Kunadharaju.  On or about September 9, 2020, MAIA offered Kunadharaju an offer of employment as its Senior Director, Product Development.  In this role, he was to be responsible for overseeing the research, development, and manufacture of innovative new products that are targeted towards helping people and bringing them to market outside the United States.  Further, he would be responsible for working with MAIA's third-party vendors, customers and suppliers towards that goal.

44.     On or around September 10, 2020, in connection with first accepting an offer of employment with MAIA, Kunadharaju entered into a "Confidentiality Agreement" (the "First Confidentiality Agreement") that, among other things, required him to: (i) "hold the Confidential Information received from MAIA in strict confidence and . . . exercise a reasonable degree of care to prevent disclosure to others;" (ii) not to "reproduce the Confidential Information or use this information commercially or for any purpose other than the performance of [your] duties for MAIA;" (iii) "not disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so in writing by MAIA management;" and (iv) "upon termination [of your employment] relationship with MAIA, deliver to MAIA any drawings, notes, documents, equipment, and materials received from MAIA or originating from [your] employment with MAIA."  *See* Declaration of Bikram Malik ("Malik Decl.") ¶ 2, Exh. A.

9

45.     On or about September 30, 2021, as a condition of his continued employment, and in consideration for which he received 6,500 MAIA common stock options (subject to a vesting schedule and other conditions), Defendant entered into a "Confidentiality, Non-Disclosure and Non-Competition Agreement" (the "Second Confidentiality Agreement"). Under the Second Confidentiality Agreement, Defendant agreed to "protect" and "safeguard" the Company's Confidential Information, including by using such materials solely for purposes of conducting Company business, strictly maintaining the confidentiality of such materials, and not disclosing MAIA's Confidential Information, or transferring, any such materials to any third party. Paragraph 8 of the Second Confidentiality Agreement provides:

> You [Kunadharaju] acknowledge that all Confidential Information and any records, files, memoranda, computer programs, reports, claims reports or records, customer lists, contracts, marketing plans, programs or forecasts and other written or printed documents or materials or other data stored on computer disks or other electronic data storage methods ("Documents") received, created or used by you during the course of your relationship with the Company are and will remain the sole property of the Company. You agree to return all such Documents (including all copies) to the Company promptly upon the termination of your employment or consultancy, or earlier upon the Company's request. (Emphasis supplied.)

Paragraph 17 required Defendant to acknowledge that "the Company is engaged in a highly competitive business" and that by virtue of the nature of his employment, "your working or being employed or engaged to work on or with or in support of any Competing Product will cause the Company great and irreparable harm." Paragraph 29 further states "[the] Company will suffer irreparable harm in the event of any actual or threatened breach by you of th[e] Agreement," and:

> [T]hat the Company may seek a restraining order, preliminary injunction, or other court order to enforce this Agreement without the necessity of posting a bond or any security that might otherwise be required in connection with such relief. You also agree[d] that any request for such relief by the Company shall be in addition and without prejudice to any claim for monetary damages which the Company might elect to assert.

6705441

Malik Decl. ¶ 3, Exh. B.

46.     In his position at MAIA, Defendant gained a deep understanding of the Company's product development processes, and was privy to the Company's most confidential information. That information included, but is not limited to MAIA's trade secrets, formulae, laboratory processes and procedures, know-how, competitive advantage, manufacturing processes, techniques, marketing plans and techniques, cost and pricing figures, customer lists, supplier lists, software, and information relating to MAIA's employees, suppliers, and persons in contractual relationships with the Company.

47.     <u>Defendant's resignation</u>.    Defendant gave his manager, Srikanth Sundaram, President & CSO MAIA ("Sundaram"), telephonic notice of his resignation on January 14, 2022. Defendant freely admitted that he had decided to leave the Company during December 2021, but had chosen not to inform the Company for weeks.  Defendant indicated that he would leave his exit date to management, but wanted to leave sooner than later.

48.     On January 18, 2022, Defendant and Mr. Sundaram spoke again by phone, and Defendant stated that he wished to leave no later than the end of the month.  In order to effectuate a transition of Defendant's responsibilities, Mr. Sundaram asked him to stay to February 4, 2022, to which Defendant agreed.

49.     During an in person exit interview with MAIA's Manager of Operations, Bikram Malik, conducted in the Company offices on January 20, 2022, Defendant refused to sign a termination agreement, which referred specifically to the products on which he had worked at MAIA and his existing confidentiality and non-compete obligations. Defendant stated that he preferred what he described as the "vagueness" of the Second Confidentiality Agreement, and not to reiterate his obligation to maintain secrecy of the Company's confidential Information, even if that meant foregoing a severance payment.

50.    Defendant also stated that he had not yet decided on his next job or venture.

51.    In a January 21, 2022 email sent from his Company email address, Defendant reaffirmed that he would not sign the termination agreement, which had been sent to him electronically.  He sent this email to the Bikram Malik, Manager of Operations stating: "I have declined to sign the documents and will take Jan. 14th as the employment termination date."  He offered to drop of his Company laptop "whenever I am in the area", or the Company could "arrange for the shipment" if needed sooner.

52.    On the same day, an IT consultant engaged by the Company retrieved Defendant's Company-provided laptop from his home, and then placed it in a secure location.

53.    <u>MAIA's discovery of Defendant's misconduct</u>.  On January 21, 2022 after the Defendant's refusal to sign the termination agreement, MAIA ran an audit of its secure cloud server. The audit logs reveal that during the approximately 12 months prior to Defendant's resignation from MAIA, he had systematically downloaded to his Company-provided laptop over 30,000 documents containing some of Company's most competitively sensitive Confidential Information from its secure electronic database that is accessible only to MAIA personnel for the purpose of performing work for the Company.

54.    Defendant downloaded approximately 10,000 of these documents during December 2021 and January 2022 alone, after (on his own account) he was had decided to leave the Company and was preparing for his departure.

55.    Much of the Confidential Information that Defendant systematically downloaded had no relationship to the three MAIA products for which he was principally responsible, the four other products on which he occasionally assisted (which was limited to certain R&D elements or

raw material issues) [MA3, MA1/MA4 & MA8][2] or the two additional products for which he was otherwise involved (strategically or on pipeline issues) [MA2 & MA5].

56.    Of the nine products that MAIA is developing, Defendant downloaded information including the research, development, manufacturing, regulatory, strategy, and other sensitive information for 4 products [MA5-MA7 & MA9]; the entire FDA regulatory submission for 5 products [MA3, MA5-MA7 & MA9]; the Canadian regulatory submission for 3 products [MA2-MA3 & MA7], the formulation and regulatory strategy and proprietary research for one product [MA9], and business, commercial and pricing information for a Canadian joint venture between the Company and a partner.  The information broadly covers clinical summaries, regulatory filings, product manufacturing, complete research and development information, regulatory meeting materials, patent and formulation strategies etc.

57.    MAIA has a formulation patent on product MA5, a provisional patent on MA6 and has filed a patent application on MA7.  MAIA has obtained FDA approval for MA1-MA4 & MA7.

58.    The following MAIA product categories, for which Defendant has misappropriated the entirety of MAIA's confidential information, are trade secrets: Formula [MA2, MA5-MA9]; Laboratory/Analytical Process [MA1-MA7]; Manufacturing Process [MA2, MA5-MA7]; Clinical/Non-Clinical Studies [MA3-MA8]; Regulatory [MA1-MA9]; Commercial Value/Competitive Advantage [MA1, MA3-MA5 & MA9] and Pricing [MA3].  *See* "MAIA Chart of Misappropriated Product Information," annexed as Exhibit A.[3]

---

[2] In order to protect the identity of these products, which are in various stages of research, development and regulatory approval, code names are used herein.
[3] Should the Court request, MAIA is prepared to submit the misappropriated documents containing the Company's trade secrets, proprietary information and confidential information, and any voluminous SecureDocs audit logs and locally accessed file logs from Defendant's laptop, to the Court  for *in camera* review.

6705441

59. A chart of Defendant's downloading activity by product reveals its magnitude:

| DATE | Document Count | Product | Market | Project | Downloaded Information |
|------|------|------|------|------|------|
| Jan. 11, 2022 | 1 | MA1 | US FDA | Not Employee Project | Clinical Summary Documentation |
| Jan. 5, 2021 | 179 | MA1 | US FDA | Not Employee Project | Sections of the Product Regulatory Filings |
| Dec. 29, 2021 | 300 | MA2 | US FDA | Not Employee Project | Sections of Drug Product Manufacturing |
| May 18, 2021 | 1,997 | MA2 | Health Canada | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including Canadian Submission |
| Dec. 10, 2020 | 3,804 | MA2 | US FDA | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including FDA Submission |
| Dec. 17, 2021 | 2,054 | MA5 | US FDA | Not Employee Project | Sections of Regulatory Strategy |
| July 29, 2021 | 4,108 | MA5 | US FDA | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including FDA Submission |
| Dec. 1-, 2021 | 4,158 | MA6 | US FDA | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including FDA Submission |
| May 21, 2021 | 5,630 | MA7 | Health Canada | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including Canadian Submission |
| Nov. 24, 2020 | 6,107 | MA7 | US FDA | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including FDA Submission |
| Mar. 1, 2021 | 8 | MA7 | US FDA | Not Employee Project | FDA Meeting Package and Regulatory Strategy Documents |
| April 5, 2021 | 1,912 | MA3 | US FDA | Not Employee Project | Complete R&D, Manufacturing and Regulatory Documentation including FDA Submission |
| Dec. 24, 2020 | 439 | MA9 | US FDA | Employee Project | Patent and Formulation Strategy Documents |

60.    The logs further indicate that Defendant increased the scale and volume of his downloading from the secure server, and focused his misappropriation activities on particularly important, and competitively sensitive data and information.  During the period from December 1,

14

2021 (on which, he admitted to the Company, he had decided to resign) to mid-January 2022 alone,

logs indicate that Defendant downloaded over 10,000 Documents.

| Date | Days Before / After Resignation | Source | MAIA Product/Matter | Employee Involvement | Downloaded Information |
|---|---|---|---|---|---|
| Nov. 15, 2021 | -60 | SecureDocs Cloud Drive Activity | Confidential Business Agreements with Canadian Partner | R&D has no need to review or download | Business Agreements between Company and Canadian Joint Venture Partner. |
| Dec. 6, 2021 | -39 | SecureDocs Cloud Drive Activity | MA5 | Employee has no direct involvement with Project | **8+ Documents** Entire Formulation Strategy and Regulatory strategy documents for a pipeline project that has not been filed with the FDA. |
| Dec. 8, 2021 | -37 | SecureDocs Cloud Drive Activity | MA8 | Employee has no direct involvement with Project | **10+ Documents** Entire formulation strategy and Regulatory Strategy for a pipeline project that has not been filed with the FDA. |
| Dec. 10, 2021 | -35 | SecureDocs Cloud Drive Activity | MA6 | Employee has no direct involvement with Project | **4000+ Documents** Entire sections of Product Development, Regulatory Strategy and FDA Filing for a project under FDA review. |
| Dec. 17, 2021 | -28 | SecureDocs Cloud Drive Activity | MA5 | Employee has no direct involvement with Project | **2000+ Documents** Entire sections of Product Development and Regulatory Strategy for a project that was subject to a 3+ year patent litigation, which has been reviewed by the FDA. |
| Dec. 29, 2021 | -16 | SecureDocs Cloud Drive Activity | MA2 | Employee was not involved with development of the drug | **300+ Documents** Entire Product Development Section for a project that was approved by the FDA in 2019. |
| Jan. 11, 2022 | -3 | SecureDocs Cloud Drive Activity | MA1 | Employee has no direct involvement with Project | **179 Documents** Entire Product Development Section for project that has been filed and approved by the FDA. |
| Jan. 12, 2022 | -2 | SecureDocs Cloud Drive Activity | MA1 | Employee has no direct involvement with Project | Employee reviews clinical summary to FDA for project. |

15

61.    <u>MAIA demands that Defendant disclose the scope of his misconduct, and Defendant lies in response</u>.  On January 24, 2022, MAIA sent Defendant a cease a desist letter. The letter reiterated Defendant's obligations under the First and Second Confidentiality Agreements, summarized the general results of the Company's server audit, and instructed him to not to disclose any Company confidential information under penalty of federal and state law.  The letter stated: "Given [the] timing and scale of your systematic downloading of the Company's Confidential Information, and the fact that much of the material you took had no apparent relationship to your work for the Company, it is apparent that you engaged [in] a massive and calculated theft scheme."  The letter provided Defendant until January 25, 2022 at 5 p.m. EST to provide the Company's counsel with a letter:

    a.  Listing <u>every</u> Company Document and other item of Confidential Information he downloaded or otherwise took from MAIA;

    b.  Stating where <u>each</u> copy of such Document or other Confidential Information is located (including any computer storage or other electronic media on which such materials are stored); and

    c.  Identifying <u>any and all</u> persons or entities with whom he shared, or to whom he transferred, any Documents or other Company Confidential Information.

Additionally, the letter demanded that Defendant return all Company documents in his possession, custody or control.  *See* January 24, 2022 letter, Declaration of David R. Lurie ("Lurie Decl."), ¶ 2, Exh. A.

62.    On January 25, 2022, Defendant sent the Company's counsel a letter denying that he had kept any Company confidential information in paper or electronic form or shared it with anyone.  He claimed that the Company "granted me access to all the files that I many have accessed during my employment" to discharge his duties as "a Senior Director."  However, Defendant offered no explanation as to why he downloaded the enormous volume of information he accessed,

including for products for which he had no responsibility. *See* January 25, 2022 Kunadharaju letter, Lurie Decl., ¶ 3, Exh. B.

63.     Accordingly, on January 26, 2022, the Company sent Defendant a letter indicating that his response was "unsatisfactory," and requesting that he execute, under penalty of perjury, a detailed Certification regarding MAIA's confidential information. The Certification defined "MAIA Confidential Information" by incorporating by reference, and attaching the Second Confidentiality Agreement. It required Defendant to certify that he did not disclose any such information to any third party, and did not retain any MAIA documents in any form.

64.     Most importantly, MAIA demanded that Defendant to identify any "device, location, person or entity" to which MAIA documents were copied or transferred, via email, server, backup service or external storage device, and to provide access to such devices, including passwords.  The Certification stated that if no such exhibit was attached, Defendant "certif[ied] to the best of my knowledge, after a reasonable and diligent review, that I cannot identify any such device, location, person or entity." *See* January 26, 2022, Lurie letter, Lurie Decl., ¶ 4, Exh. C.

65.     On January 27, 2022, Defendant forwarded an executed copy of the Certification, but omitted to attach an exhibit. *See* Kunadharaju Certification, Lurie Decl., ¶ 5, Exh. D.  MAIA's counsel then sent Defendant an email noting the missing exhibit, and seeking clarification as to Defendant's intentions.  Lurie Decl., ¶ 6, Exh. E.

66.     Defendant then sent a "re-executed" Certification with Exhibit B, specifically stating "NONE APPLICABLE," denying possession of "any materials constituting MAIA documents" or transferring such materials to a person or entity in any form, "including without limitation, email, servers, backup or synchronization services or backup storage devices." *See* "Re-Executed" Kunadharaju Certification,  Lurie Decl., ¶ 7, Exh. F.

6705441

67.    A forensic examination confirms the gravity of Defendant's misconduct, and his effort to cover it up.  During January 27-28, 2022, the Company's computer forensic specialist performed a preliminary analysis of Defendant's Company-provided laptop.  The forensic specialist made the following findings:

68.    First, the examination established that Defendant downloaded materials from MAIA's secure cloud server onto the laptop containing Company Trade Secrets, and then, after accessing (and likely copying) the files, systematically deleted them.

69.    None of the folders in the Company laptop contain any of the files that Defendant downloaded from the MAIA SecureDocs server, as reflected in the Company's access log. Indeed, apart from eleven files remaining in the laptop's "Downloads" folder and seventeen remaining in the laptop's "Documents" folder, there are virtually no MAIA-related files remaining on the laptop, a device that Defendant used to conduct his work for MAIA for 15 months.

70.    The data available on the laptop does, however, indicate that Defendant employed the laptop to download at least some of documents listed on the SecureDocs server log, and thereafter deleted them. Among the files that once resided on the laptop, but have since been deleted, are, for example, a large number of SecureDocs archive files that were downloaded on December 29, 2021.

71.    The forensic investigation established that those and every other document that defendant downloaded onto the laptop from the secure server had been deleted by January 18, 2022, shortly before MAIA's IT consultant recovered the laptop from Defendant.

72.    Second, the forensic examination established that Defendant attached a number of universal serial bus ("USB") mass storage devices, as well as devices capable or printing and scanning, to the laptop during or adjacent to the time that he was downloading data containing

Trade Secrets from MAIA's secure server, each of which was identified by serial number or other identifying information by the forensic specialist.

73.    For example, a Lexar device, bearing volume serial number VSN 62497575, was last connected to the laptop on January 20, 2022; an HP OfficeJetPro printer/scanner bearing serial number 8&F1A7943&0&0002 was last connected to the laptop on January 13, 2022; and a Kingston Data Traveler 2 bearing serial number C86000BDB9EBCE703A187B43, was last connected to the laptop connected on November 8, 2021.

74.    The only way to determine what Trade Secret data Defendant copied or downloaded onto one or more of the USB devices that Defendant attached to the laptop is to forensically examine each of those devices.

75.    <u>Third</u>, the forensic examinations established that Defendant repeatedly employed the laptop to access a "Google Drive" account, a cloud-based data storage service, most recently on January 18, 2022.  The forensic specialist examined the Internet history of the laptop and found approximately 102 entries that show visits to Google Drive from July 23, 2021 to January 18, 2022.

76.    <u>MAIA</u> does not use the Google Drive service; accordingly, the account at issue was personal to the Defendant, and not a Company account.

77.    A comparison of the MAIA SecureDocs log to the Internet history entries indicates that Defendant repeatedly accessed his personal Google Drive account during or adjacent to periods of time during that he downloaded documents containing MAIA Trade Secret materials from the MAIA SecureDocs server.

78.    For example, the SecureDocs log indicates that, on December 17, 2022 between the hours of 15:24 to 15:37 EST, the Defendant downloaded approximately 2,054 documents

containing MAIA's confidential information from SecureDocs server, while the Internet history entries indicate that Defendant accessed his Google Drive account at virtually the same time (*i.e*., between 15:25 and 15:27 EST).

79.    It is not possible to determine which files or other data Defendant may have uploaded into his Google Drive account from the laptop without access to that online account. The Defendant's password and other credentials will be required to gain such access.

80.    Finally, the forensic examination established that the Defendant used a computer other than his Company issued laptop to access and download tens of thousands of files containing some of MAIA's most valuable, and competitively sensitive, trade secrets.

81.    The forensic specialist used software to capture the company-owned laptop's Internet browsing history for the period October 2, 2020 through January 19, 2022.  That browsing history shows visits to MAIA's secure server on December 29, 28, 20 and 16, 2021; each of those visits is also reflected in the MAIA SecureDocs Log.

82.    The server log, however, also indicates that the Defendant accessed MAIA's secure server on December 17, 2021 (when he downloaded 2,054 files) and on December 10, 2021 (when he downloaded 4,152 files).  The files Defendant downloaded on those two days contain some of the very most valuable, and competitively sensitive of MAIA's Trade Secrets.

83.    The laptop's browsing history does not indicate that the Defendant used the Company-owned laptop to access the secure server on either of those day.

84.    Accordingly, the forensic specialist concluded that Defendant employed his password and other credentials to log onto the server from another computer that did not belong to MAIA, and thereafter downloaded MAIA's Trade Secrets onto that non-Company.  *See* January Declaration of Tino Kyprianou MSc, CCE, CFE of Axiana LLC, at ¶¶16-39.

85.     Accordingly, the forensic analysis of the laptop directly contradicts Defendant's Certification that he could not identify any "device, location, person or entity" to which MAIA documents were copied or transferred, such as a "server, backup service or external storage device."

86.     To the direct contrary, the forensic examination establishes that Defendant downloaded massive quantities of the Company's most valuable trade secrets onto a non-Company Computer, and furthermore indicates that it is likely that he transferred such materials from the Company-owned Computer onto mass storage devices and his personal Google Drive account.

87.     In sum, Defendant engaged in a long term, systematic effort to steal MAIA confidential information, in the most sweeping and indiscriminate manner imaginable.

88.     Defendant has breached his contractual, fiduciary and other obligations to MAIA, including by (i) unlawfully stealing MAIA's Confidential Information; (ii) likely scheming to disclose, the Confidential Information he misappropriated to third parties for the purpose of illegally competing with MAIA; or (iii) planning to use the Confidential Information to unlawfully compete with MAIA himself.

89.     Unless this Court restrains Defendant from continuing to breach the Second Confidentiality Agreement, and his obligations under federal and state statutory and common law, MAIA will suffer substantial and irreparable injury, including: 1) the wrongful use and exploitation of the Company's trade secrets and confidential and proprietary information; and 2) the loss of the basic protections created by the non-disclosure agreements applicable to Defendant.

6705441

## COUNT ONE
### Violation of Defend Trade Secret Act ("DTSA"), 18 U.S.C.§1836 (a), *et. seq.*

90.    Plaintiff repeats each of the foregoing allegations as if set forth fully herein.

91.    Under the DTSA, a "Trade Secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . ." 18 U.S.C. §1839 (3).

92.    MAIA is the owner of certain Trade Secrets in which it has a rightful legal or equitable title, or license under 18 U.S.C. §1839 (4).

93.    MAIA took reasonable measures to keep this information secret, and the information derives independent economic value, actual or potential, from not being generally known to, or not being readily ascertainable through proper means by another person who can obtain economic value from its disclosure or use.  18 U.S.C. §1839 (3)(A) &(B)

94.    Defendant misappropriated MAIA's Trade Secrets because he acquired it through improper and unauthorized means, including breaching his duty to maintain its secrecy under the First and Second Confidentiality Agreements.  18 U.S.C. §1839 (5)(A) & (6).

95.    MAIA's Trade Secrets are used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. §1836 (b)(1).

96.    In his Second Confidentiality Agreement, Defendant acknowledged his working on or with any competing product or breaching that Agreement would cause MAIA irreparable harm.

97.    Defendant's misconduct was and remains willful and malicious.

6705441

98.     Defendant's misconduct has damaged Plaintiff and violates the Defend Trade Secret Act, 18 U.S.C.§1836 (a), *et. seq.*

## COUNT TWO
### Violation of New Jersey Uniform Trade Secrets Act ("NJUTSA"), N.J.S.A. 56:15-1, *et seq.*

99.     Plaintiff repeats each of the foregoing allegations as if set forth fully herein.

100.     Under the NJUTSA, a "Trade Secret" means information, "without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. . . ." N.J.S.A. 56:15-2.

101.     Plaintiff's Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by Plaintiff's competitors who can obtain economic value from its disclosure or use; and are the subject of reasonable efforts by MAIA to maintain its secrecy.

102.     As described above, Defendant used improper and unauthorized means to misappropriate Plaintiff's Trade Secrets with the goal of obtaining an unfair competitive advantage.

103.     Defendant's misconduct was and remains willful and malicious.

104.     Defendant's misconduct has damaged Plaintiff and violates New Jersey's Uniform Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.*

6705441

## COUNT THREE
### Breach of Confidentiality Agreements

105.    Plaintiff repeats each of the foregoing allegations as if set forth fully herein.

106.    As a condition of his employment with MAIA, and for valuable consideration, Defendant entered into two Confidentiality Agreements.

107.    Under the Second Confidentiality, Defendant agreed to "protect" and "safeguard" the Company's Confidential Information, including by using such materials <u>solely</u> for purposes of conducting Company business, strictly maintaining the confidentiality of such materials, and not disclosing MAIA's Confidential Information, or transferring, any such materials to any third party.

108.    Defendant acknowledged that the Company's Confidential Information belong solely to MAIA and that he was obligated to return all of it upon the termination of his employment.

109.    Defendant has breached the Second Confidentiality Agreement by misappropriating MAIA Confidential Information.

110.    Defendant's breach is malicious, intentional and egregious.

111.    Defendant's breach has caused MAIA damages, including disruption to its business, and the expense of counsel and experts.

## COUNT FOUR
### Breach of Duty of Loyalty

112.    Plaintiff repeats each of the foregoing allegations as if set forth fully herein.

113.    Defendant, as an officer and employee of MAIA, owed it a duty of loyalty.

114.    By reason of his conduct, Defendant has breached his duty of loyalty and caused MAIA harm.

6705441

115.    Defendant's conduct is malicious, intentional and egregious.

**WHEREFORE,** Plaintiff MAIA demands judgment against Defendant Kunadharaju, as follows:

First, temporarily, preliminarily and permanently enjoining and/or restraining, Defendant under Fed. R. Civ. Pro. 65 and L. Civ. R. 65.1, as follows:

    a)  Prohibiting Defendant from further accessing or using any of MAIA's Trade Secrets, or any documents or other materials containing such Trade Secrets, for any purpose not expressly authorized by the Court;

    b)  Prohibiting Defendant from publicizing, disseminating or transferring MAIA's Trade Secrets to any person or entity not expressly authorized by the Court; and

    c)  Requiring Defendant to identify any and all persons or entities with whom he shared, or to whom he transferred, any MAIA Trade Secret.

Second, ordering Defendant to Produce for inspection and analysis by MAIA's computer forensic expert all:

    a)   data storage, copying and printing devices in his custody or control, including (but not limited to) hard drives, solid state drives, USB drives, mobile telephones, printers and scanners, etc. or other device specifically identified by MAIA's forensic specialist;

    b)  computers in his custody or control; and

    c)   passwords, user IDs and other materials required to access each Internet-based data storage account to which Defendants has access, including (but not limited to) Defendant's Google Drive account(s).

Finally, awarding MAIA:

    a)  Damages for the misappropriation of its Trade Secrets, including actual losses, unjust enrichment, imposition of a reasonable royalty for any unauthorized disclosure of the Trade Secrets, if applicable, and exemplary damages in an amount to be determined at trial;

    b)  Its reasonable attorney's fees and other costs of this Action; and

    c)  Such other and further relief as the Court deems equitable and just.

6705441

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
Morristown, NJ  07962
Tel.: (973) 538-4006
Fax: (973) 538-5146
Attorneys for Plaintiff

By:  Steven P. Benenson
An Attorney of the Firm
_s/Steven P. Benenson_

**Law Office of David R. Lurie, PLLC**
194 President Street
Brooklyn, NY 11231
Of Counsel

Dated: February 4, 2022

6705441

## VERIFICATION

I, BIKRAM MALIK, being of full age, do hereby verify as follows:

1.      I am the Operations Manager of MAIA Pharmaceuticals, Inc.

2.      I have reviewed the annexed Verified Complaint in Support of Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction. The statements made therein are true and correct to the best of my personal knowledge.

3.      I hereby verify under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. Code §1746.

Executed On:   February 4, 2022

BIKRAM MALIK
MAIA Pharmaceuticals, Inc.

6705441

# EXHIBIT  A

# EXHIBIT  A

| | Code Name | Formula | Laboratory / Analytical Process | Manufacturing Process | Clinical / Non-Clinical Studies | Regulatory | Commercial Value / Competitive Advantage | Pricing / Commercial Plans |
|---|---|---|---|---|---|---|---|---|
| | | | | | **Trade Secret** | | | |
| 1 | MA1 | No | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | No | No | Yes - Entire regulatory Filing including the correspondence with FDA have been downloaded by Employee | Yes Employee has this as part of FDA Filing (Commercial Justification for Fast Track Approval) | Yes |
| 2 | MA2 | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | No | Yes - Entire regulatory Filing including the correspondence with FDA have been downloaded by Employee | No | Yes |
| 3 | MA3 | No | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | No | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Employee downloaded Commercial Arrangement and Pricing Information for Canadian Market |
| 4 | MA4 | No | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | No | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes Employee has this as part of FDA Filing (Commercial Justification for Fast Track Approval) | Yes |
| 5 | MA5 | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes Employee has this as part of FDA Filing (Commercial Justification for Fast Track Approval) | Yes |
| 6 | MA6 | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes | Yes |
| 7 | MA7 | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes - Contained in FDA Filing (Not Public) Employee has this as part of FDA Regulatory Filing. | Yes | Yes |

6703062

| | Code Name | Trade Secret | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Formula | Laboratory / Analytical Process | Manufacturing Process | Clinical / Non-Clinical Studies | Regulatory | Commercial Value / Competitive Advantage | Pricing / Commercial Plans |
| 8 | MA8 | **Yes - Employee had access to formulation development data to prepare draft patent application** | Yes | Yes | **Yes - Employee has downloaded Clinical justification documents not yet filed with FDA** | **Yes - Employee has dowloaded FDA Meeting Materials for Planned Meeting** | Yes | Yes |
| 9 | MA9 | **Yes - 6+ months of formula ideas with Chief Scientific Officer have been taken by Employee** | Yes | Yes | Yes | **Yes - Regulatory strategy documents have been downloaded by Employee** | **Yes - Employee has downloaded market research and strategy documents** | Yes |

6703062